IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELIZABETH GALVIN<br>4831 Indian Lane, N.W.<br>Washington, D.C. 20016 | : <br> : <br> : <br> : <br> : | |
| Plaintiff, | : <br> : | Civil Action |
| v. | : <br> : | No. 1:20-cv-2239 |
| DEAN GRAVES<br>15409 Quail Run Drive<br>Darnestown, Maryland 20878 | : <br> : <br> : <br> : <br> : <br> : | **JURY TRIAL DEMANDED** |
| Defendant | : <br> : | |

**COMPLAINT FOR RELIEF**

Paul A. Cunningham (D.C. Bar No. 263210)
Neill C. Kling (*Pro Hac Vice* to be filed)
HARKINS CUNNINGHAM LLP
1750 K Street, N.W., Suite 300
Washington, D.C. 20006-3804
(202) 973-7600

## **COMPLAINT FOR RELIEF**

Plaintiff Ms. Elizabeth Galvin ("Ms. Galvin") seeks relief regarding landscaping services for which she contracted with Defendant Mr. Dean Graves ("Mr. Graves") which were never satisfactorily completed, and which failed to make her property suitable for its intended personal, business, and philanthropic purposes.

## **PARTIES**

1. Plaintiff Ms. Galvin is a citizen and resident of the District of Columbia who has resided for over 20 years at 4831 Indian Lane, N.W. Washington, D.C. 20016 (the "Residence").

2. Upon information and belief, Defendant Mr. Graves is an individual residing in the State of Maryland whose principal place of business is in Darnestown, Maryland, and whose principal occupation is the provision of landscaping services.

## **JURISDICTION**

3. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000 exclusive of interest and costs, and this is a civil action between a citizen of the District of Columbia and a citizen of the State of Maryland.

4. This Court may exercise personal jurisdiction over Mr. Graves under D.C. Code § 13-423(a)(1)-(4) because the matter concerns work Mr. Graves performed for Ms. Galvin in the District of Columbia.

## **VENUE**

5. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because the claims

arose substantially from events or omissions that occurred on property in this judicial district.

## GENERAL ALLEGATIONS

6.     The Residence is on a large property in a densely populated urban area. The property's landscaping requires significant stormwater management, state-of-the-art soil preparation, and careful planting and maintenance of flora. This presents a challenge for any landscaping professional hired to perform work at the Residence.

7.     The back lawn and poolside lawn of the Residence (together, the "Lawn") and other elements of the Residence garden were designed as a visual and physical extension of the interior of the Residence and were frequently used for many years by Ms. Galvin as a welcoming venue for personal, business, and philanthropic gatherings.

8.     The Lawn and the Residence garden are the product of intricate and integrated architectural and landscape designs. Preparation, planting, maintenance, and repair of the Lawn and Residence garden require highly specialized labor and effort.

9.     In or about the spring of 2015, Ms. Galvin noticed signs of aging in the Lawn that suggested repairs to the Lawn and the underlying drainage and other infrastructure might be necessary to continue its role as an outdoor extension of the Residence. Ms. Galvin sought a professional assessment of the sustainability of the Lawn and its underlying drainage and other infrastructure.

10.    Ms. Galvin hired Planted Earth, Incorporated ("Planted Earth"), which represented itself as a landscaping company capable of providing an assessment and of performing any landscaping services required to assure the Lawn could serve the purposes for which it was intended.

11. Planted Earth informed Ms. Galvin on April 22, 2016 it had "repaired the lawn as necessary."

12. The replacement sod installed by Planted Earth after it had supposedly performed repairs to the infrastructure of the Lawn lasted no more than three months. Planted Earth subsequently installed additional replacement sod.

13. Ms. Galvin informed Planted Earth that the Lawn—including the first and second applications of replacement sod—had deteriorated and attracted raccoons to the Residence which dug into the sod, causing further damage.

14. Aware that whether a lawn has been established cannot necessarily be determined by its short-term performance but concerned about the state of the Lawn, Ms. Galvin engaged Mr. Graves, purportedly an expert in landscaping, to inspect the Lawn.

15. Ms. Galvin hired Mr. Graves based on his representation he could identify the reasons the Lawn was deteriorating and on his extensive and effusive representations he had the requisite knowledge and experience to restore the Lawn to a healthy and usable state.

16. On or about August 18, 2016, Mr. Graves visited the residence and inspected the lawn. During the inspection, Mr. Graves took multiple soil samples from the Lawn. On or about August 23, Mr. Graves reported that the soil samples revealed there was insufficient drainage and other infrastructure necessary to permit water to drain from the Lawn and that the Lawn could not be established as required to suit its purposes without further repairs. Mr. Graves represented he could make those repairs.

17. On August 23, 2016, Mr. Graves also met with the landscaping firm Groundbreaking Landscaping, Inc. ("Groundbreaking") at an unknown location about the prospect of providing services at Mr. Graves' direction to support his work on the Lawn. Ms. Galvin informed Mr.

3

Graves she could not attend that meeting but expressed her confidence in his capacity to select and supervise the professional assistance he would need to perform his work.

18. Mr. Graves, with Groundbreaking as his subcontractor, devised and executed a plan to remediate the sod around the pool patio, eliminate brown, desiccated patches of grass with a fungicide program, install additional drainage infrastructure, and restore the Lawn to a healthy and sustainable state.

19. Mr. Graves commenced his work on the Lawn on August 30, 2016, beginning with expedited temporary repairs to the section of the Lawn adjacent to the swimming to permit its use for a gathering to be held at the Residence.

20. Throughout the duration of his work on the Lawn, Mr. Graves several times provided Ms. Galvin and her gardener, Ms. Nancy Sainburg, with care and irrigation instructions for the Lawn orally at the Residence or by emails sent from an unknown location or locations. Ms. Galvin and Ms. Sainburg adhered to these instructions. When instructions were not forthcoming from Mr. Graves, Ms. Galvin and Ms. Sainburg requested them, as both relied on Mr. Grave's purported expertise.

21. During Graves' work on the Lawn, Ms. Galvin seldom, if ever, communicated directly with Groundbreaking. She deferred to Mr. Graves' expertise and oversight of Groundbreaking's workers. Ms. Galvin also received all Groundbreaking's invoices via emails sent by Mr. Graves from an unknown location or locations.

22. On October 12, 2016, Mr. Graves informed Ms. Galvin via email from an unknown location that Groundbreaking requested a payment of $30,000 for the "first phase of construction," which included "mobilization, removal of sod, excavation, and removal of spoils." In reply, Ms. Galvin inquired whether she had received or would receive a proposal detailing the

4

major work to be conducted on the Lawn. Mr. Graves neither responded to her query nor provided such a proposal. Ms. Galvin made the requested payment on October 13, 2016.

23. In an email sent from an unknown location dated on November 21, 2016 providing an update on progress to Ms. Galvin, Mr. Graves indicated that sod installation for the Lawn was complete.

24. On December 2, 2016, via an email sent from the Residence, Ms. Galvin raised concerns with Mr. Graves that the Lawn had grooves between pieces of sod and the sod had an inconsistent color. Mr. Graves replied to Ms. Galvin via email sent from an unknown location indicating that both these problems would disappear by spring as the grass grew.

25. On December 15, 2016, Mr. Graves stated in an email sent from an unknown location to Ms. Galvin he would make another application of fertilizer to the Lawn in spring which "will encourage root initiation and elongation so the sod will have a healthy foundation for summer," and added, "In summary, the grow-in [of the sod] is going well." Mr. Graves also stated in this email he would soon send Ms. Galvin an email containing his final invoice.

26. On December 15, 2016, Ms. Galvin replied via email from the Residence writing "I am glad to pay the full amount [of the invoice] without holding a completion sum (after all, I never saw a proposal that contained pricing and conditions on performance), on the assumption that the lawn will ultimately be as you committed to me."

27. In further emails sent from the Residence dated December 16, 2016 and February 23, March 16, and March 24, 2017, Ms. Galvin continued to raise issues with the appearance and usability of the lawn with Mr. Graves. He repeatedly assured her via emails sent from an unknown location or locations that the Lawn was healthy and that, if she and Ms. Sainburg followed his care instructions, the problems she identified would no longer be evident in spring.

28. On March 2, 2017, Mr. Shawn Siefers, an arborist hired by Ms. Galvin, informed Ms. Galvin via an email sent from an unknown location he was dissatisfied that Mr. Graves had said "he would be handling the turf until it was rooted in [in spring] and we [Mr. Siefers and Ms. Sainburg] have not heard anything from him."

29. In or about mid-March 2017, Ms. Galvin noticed depressions in the Lawn and that the sod bordering the street and sidewalk was lumpy. On both March 22 and March 24, Mr. Graves indicated via emails sent from an unknown location or locations these problems would be ameliorated by Groundbreaking and him.

30. On June 4, 2017, Ms. Galvin indicated via email to Mr. Graves that "extensive brown grass" persisted. She reiterated this concern to him four days later.

31. On June 10, 2017, Mr. Graves represented to Ms. Galvin that his work was complete via an email sent from an unknown location, writing, "At the beginning of this project I explained that my responsibilities would be to manage establish and grow-in the lawn. Beyond the lawn care would pass to someone else. We are at that point of maturity with the lawn."

32. In 2016 and 2017, Ms. Galvin paid Graves $31,868 and Groundbreaking (as Graves' subcontractor) $68,160 for their work and materials used on the Lawn.

33. In the spring of 2018, it became clear to Ms. Galvin that the Lawn had not been established following Mr. Grave's work, and would not be suitable for the purposes for which it was intended without additional major restoration work.

34. Ms. Galvin hired landscape architect Ms. Melissa Gildea to help restore the Lawn.

35. On information and belief, Ms. Gildea contacted Mr. Graves in April 2018 about the prospect of him returning to repair the damage he caused to the Lawn. She reported to Ms. Galvin on April 25, 2018 via email from an unknown location that "I spoke with Dean [Graves].

6

He and his contractor [Groundbreaking] will charge $13,0242.00 to repair the sod/patch it, or $23,429 to complete replace. It." (*sic*).

36.	Ms. Galvin wrote in reply via an email sent from the Residence, "I will not pay Dean [Graves] one cent since he failed in his obligation to us last year…"

37.	Since Mr. Graves ceased work, the Lawn has deteriorated further, notwithstanding Ms. Galvin's outlays to other contractors to remedy it.

38.	Ms. Galvin sued Planted Earth in this Court on August 16, 2019, alleging breaches of contract and warranty and violations of the District of Columbia Consumer Protection Procedures Act. That action is pending in this Court as Civil Action No. 1:19-cv-2483.

39.	Ms. Galvin has spent and expects to spend substantial additional funds to discover and remediate all the problems that Defendant Graves had purported to solve and to restore the Lawn.

## COUNT I
## Breach of Oral Contract

40.	The allegations in Paragraphs 1 through 39 are incorporated by reference.

41.	Mr. Graves represented that the drainage infrastructure, replacement sod, and fertilizer and antifungal treatments provided by Mr. Graves and Groundbreaking would restore the aesthetic and physical vitality of the Lawn, assure the sustainability of the Lawn in a state suitable for its intended purposes..

42.	On information and belief, Ms. Galvin suspects the underlying drainage and other infrastructure and installations repaired or replaced by Mr. Graves cannot sustain a thriving Lawn, and whether Mr. Graves provided any value to Ms. Galvin for the sums that she paid.

7

43. Ms. Galvin complied with the oral agreement and performed her obligations by compensating Mr. Graves and Groundbreaking for the services and materials Mr. Graves contracted to provide.

44. As the services and materials Mr. Graves provided or purported to provide did not fulfill Mr. Graves' representations and commitments to re-establish a sustainable Lawn, Mr. Graves breached the oral agreement.

## COUNT II
## Breach of Implied Warranties for Merchantability and Fitness for Particular Purpose

45. The allegations in Paragraphs 1 through 44 are incorporated by reference.

46. The Uniform Commercial Code, as codified in the District of Columbia, provides that "Unless excluded or modified . . . a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind" (D.C. Code § 28:2-314(1)), and that "Goods to be merchantable must be at least such as . . . (c) are fit for the ordinary purposes for which such goods are used." D.C. Code § 28:2-314(2).

47. Regarding common landscaping goods, including but not limited to sod, gravel, fertilizer, mulch, plastic coverings, and various other drainage materials and infrastructure, Mr. Graves is a "merchant" under the definition at D.C. Code § 28:1-104(1).

48. The goods Mr. Graves sold to Ms. Galvin proved inadequate to ameliorate the state of the Lawn.

49. Mr. Graves therefore breached the implied warranty for the merchantability of the goods he sold Ms. Galvin.

50. The Uniform Commercial Code, as codified, further provides that "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are

8

required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose." D.C. Code § 28:2-315(1).

51. As a person holding himself out to be an expert in the business of landscaping, Mr. Graves has reason to know which goods in a lawn landscaping project, including necessary layers below the sod, are required and for what purposes. As a lay individual, Ms. Galvin, relying on Mr. Graves' representations, placed her trust in Mr. Graves and, based on his extensive and effusive representations, relied on his judgment to select and furnish all goods necessary and sufficient to restore the Lawn.

52. At the very least, the goods that Graves used and installed on the Lawn were unfit to facilitate water drainage, reestablish a sustainable Lawn with a homogeneous color and texture, suitable for its intended purposes. Mr. Graves therefore breached the implied warranty of fitness for these purposes.

## COUNT III
## Violations of the Consumer Protection Procedures Act

53. The allegations in Paragraphs 1 through 52 are incorporated by reference.

54. Mr. Graves misrepresented to Ms. Galvin orally at the Residence and via emails sent from unknown locations which constitute violations of the District of Columbia Consumer Protection Procedures Act (the "CPPA").

55. The purpose of the CPPA is to "promote, through effective enforcement, fair business practices throughout the community." D.C. Code § 28-3901(b)(2).

56. The CPPA "shall be construed and applied liberally to promote its purpose. This chapter establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of

9

Columbia." D.C. Code § 28-3901(c).

57. Ms. Galvin is a member of the community entitled to enjoy fair business practices and truthful information when contracting for services in the District of Columbia. Mr. Graves denied her this enforceable right.

58. The District of Columbia, as the *lex loci delicti*, the place of Ms. Galvin's residence, and with the public policy interest outlined above in mind, has a substantial interest in resolving this issue.

59. By claiming that his services would allow the Lawn to thrive, become passable on foot, regain its former homogeneous green coloration and texture, and be sustainable, Mr. Graves represented that his goods and services had "uses, benefits, or qualities that they do not have" in violation of the CPPA. D.C. Code § 28- 3904(a).

60. Graves also represented that the goods and services he provided would be "of a particular standard, quality, grade, style, or model" but they were not. D.C. Code § 28-3904(d).

61. By performing only superficial work, failing to repair the cause of the damage, and claiming to have completed all necessary work, Mr. Graves "falsely . . . represent[ed] that repairs, alterations, modifications, or servicing ha[d] been made and receiv[ed] remuneration therefor when they [had] not been made." D.C. Code § 28-3904(p).

62. Because of these violations of the CPPA, Ms. Galvin

   a. contracted with and compensated Mr. Graves for work which she otherwise would not have contracted for,

   b. delayed hiring other contractors to repair the damage done to the Lawn by Mr. Graves, and

   c. has lost much of the value of the Lawn as a visual and physical extension of the

interior of the Residence and as a welcoming venue for personal, business, and philanthropic gatherings.

## DAMAGES INCURRED

63. The allegations in Paragraphs 1 through 62 are incorporated by reference.

64. Because of Defendant Graves' conduct, Ms. Galvin suffered monetary damages including but not limited to:

    a. The amounts that Ms. Galvin spent for work not performed adequately and, sometimes not performed.

    b. The amounts that Ms. Galvin spent for goods that failed to meet the implied warranties of merchantability and fitness for a particular purpose.

    c. The amounts that Ms. Galvin has spent or expects to spend to rectify the damages caused to her property because of the breaches and misrepresentations detailed above, which are ongoing.

    d. Amounts reflecting the impaired value of the lawn as a venue for private and charitable functions.

    e. Amounts reflecting the reduced market and utility value of the Residence resulting from the poor appearance, impassability, and suitability for the Lawn's intended purposes as a visual and physical extension of the Residence and a welcoming venue for personal, business, and philanthropic gatherings hosted by Ms. Galvin.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests this Court enter judgment for Ms. Galvin and against Mr. Graves, award her contract damages for breach, award her compensatory damages for costs expended and to be expended in remediating the problems not remediated by

11

Mr. Graves, award her additional compensatory damages for diminution of the market and utility value of the Residence caused by Mr. Graves, award her treble and punitive damages for the violations of the CPPA, and award her attorneys' fees.

Respectfully submitted,

/s/ Paul A. Cunningham
Paul A. Cunningham (D.C. Bar No. 263210)
Neill C. Kling (*Pro Hac Vice* to be filed)
HARKINS CUNNINGHAM LLP
1750 K Street, N.W., Suite 300
Washington, D.C. 20006-3804
(202) 973-7600

Dated: August 14, 2020